**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-1590

_____

Richard J. Reynolds,                    *
                                        *
        Plaintiff - Appellant,*
                                        *   Appeal from the United States
    v.                                  *   District Court for the District
                                        *   of South Dakota.
Land O'Lakes, Inc.,                     *
                                        *
        Defendant - Appellee. *
                        _____

            Submitted:  October 22, 1996

                Filed:  April 25, 1997
                        _____

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON and McMILLIAN,
    Circuit Judges.
                        _____


FLOYD R. GIBSON, Circuit Judge.


        Appellant Richard J. Reynolds sued his employer, Land O'Lakes, Inc.
(LOL), for an alleged violation of the Age Discrimination in Employment Act
(ADEA), 29 U.S.C. §§ 621-634 (1994).  Reynolds also brought a state law
deceit claim against LOL.  See S.D. Codified Laws § 20-10-1 (Michie 1995).
On February 2, 1996, the district court[1] granted LOL's motion for summary
judgment adducing that Reynolds failed to present a prima facie case of
either age discrimination or deceit.  Reynolds appeals the district court's

_____

    [1]The HONORABLE JOHN B. JONES, Senior United States District
Judge for the District of South Dakota.

grant of summary judgment.  Because we determine that Reynolds failed to establish a claim for either age discrimination or deceit, we affirm the district court's decision.

I.    **BACKGROUND**

LOL  is  a  an  agricultural  supply  and  marketing  cooperative incorporated in the state of Minnesota.  As a farmer owned cooperative, LOL sells dairy goods produced from milk its farmer members supply.  Within LOL's dairy foods business there are several divisions, one of which is the procurement division.  Reynolds began working for LOL in 1983, and from October 1985 through January 1994, he worked as a milk production specialist (MPS) in the procurement division's Western region.  An MPS serves as the primary direct contact between the dairy producer and LOL.  MPS's procure milk for the cooperative and provide milk producers with a variety of services to enhance milk production and milk quality.

During the late 1980's and early 1990's, the procurement division experienced a continual decline in the number of milk producers in the Midwest, while the cost of doing business steadily increased.  For example, when Reynolds began working as an MPS in 1985, he called on 185 to 200 milk producers, and eleven other MPS's worked in the Western region.  By 1993, Reynolds served only 85 to 100 milk producers, and only eight additional MPS's remained in his region.  In approximately 1990, the Roger Rudolph Marketing Firm conducted a survey of LOL's business practices and developed an "ideal producer target" which highlighted specific qualities MPS's should look for when attempting to obtain business from dairy farmers.  By targeting the "ideal producer," LOL intended to attract producers who would remain in the dairy production business

for a substantial period of time. The "ideal producer," according to the Rudolph survey, is forty-four years of age or younger, a production manager, has more than one hundred cows, and produces more than one million pounds of milk per year.

In 1993, LOL determined that the procurement division needed to reduce costs. The regional managers, including Jeff Johnson, Harlan Heidebrink, and Ray Cherry, together with Don Berg, the vice president of membership and procurement, decided that a reduction in force (RIF) would be the most effective method of reducing costs. The management group considered various criteria to apply in determining which MPS's to terminate, but concluded that eliminating the least senior MPS in each of the Western, Northwestern, and Dalbo regions, and the two least senior MPS's in the Southeastern region, would be the most equitable method of implementing the RIF. The number of positions to be eliminated was based on geography, milk volume, and producer numbers. LOL's legal and human resource departments approved the planned RIF.

On October 13, 1993, LOL announced the planned reduction to the MPS staff. LOL solicited volunteers, but because no one accepted the voluntary severance package, management carried through with the RIF as planned. Management notified the terminated employees on October 22, 1993 of the impending terminations and severance packages.[2] Reynolds was the least

---

[2]The severance package allowed terminated employees to remain on full-time active status for twelve weeks from the date of severance (October 22, 1993, through January 14, 1994). Management allowed 60% of terminated employees' time to be dedicated to searching for new jobs. Pay and insurance coverage would continue for ten weeks after January 14, 1994, and terminated employees could elect to continue insurance coverage for up to eighteen months if they were willing to pay the premiums. LOL also agreed to pay terminated employees for 100% of their accrued personal flex time (five weeks for Reynolds).

senior MPS in the Western region and was therefore eliminated in the RIF. Three of the five MPS's eliminated were under forty years of age. At forty-five, Reynolds was the oldest MPS terminated in the RIF.

LOL has a policy of awarding a hiring preference to employees who are terminated in a RIF. Terminated employees have access to a posting board which lists current available positions within the company. However, employees terminated in a RIF may not simply "transfer" to another position. They must go through the application process to be eligible for the rehire preference. Ray Cherry notified Reynolds of available temporary assignments in Poland and Cottonwood, Minnesota; Scott Gottschalk also informed Reynolds of the Cottonwood assignment. Reynolds did not apply for either position. Reynolds applied for one position with LOL after his termination, but that space was filled by a part-time LOL employee who was apparently more qualified for the position. Immediately following his termination, Reynolds began searching for positions within and outside of LOL.

Reynolds commenced a civil action against LOL on March 20, 1995, alleging age discrimination in violation of the ADEA, see 29 U.S.C. §§ 621-634, and deceit in violation of S.D. Codified Laws § 20-10-1. LOL filed a motion for summary judgment on December 18, 1995. On February 2, 1996, the district court granted LOL's motion for summary judgment, concluding that Reynolds failed to establish a prima facie case of either age discrimination or deceit.

## II.   DISCUSSION

We review a grant of summary judgement de novo. See Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1315 (8th Cir.

1996).  We must determine, after viewing the record in the light most favorable to the nonmoving party, whether there is a genuine issue as to any material fact.  See id.  If there is not, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)); accord Aucutt, 85 F.3d at 1315.

### A.    ADEA claim

The Title VII burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), and refined in Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248 (1981), applies to discrimination cases brought under the ADEA.  See Holley v. Sanyo Mfg., Inc., 771 F.2d 1161, 1164 (8th Cir. 1985).  Under the McDonnell Douglas analysis, the plaintiff must first establish a prima facie case.  See McDonnell Douglas, 411 U.S. at 802; Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 776 (8th Cir. 1995).  To establish a prima facie case, a plaintiff must show: (1) he is within the protected age group; (2) he met the applicable job qualifications; and (3) he was discharged.  See Hutson, 63 F.3d at 776.  A RIF plaintiff must also "provide some 'additional showing' that age was a factor in the termination."  Id. (quoting Holley, 771 F.2d at 1165.).  Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant to show a legitimate, nondiscriminatory reason for terminating the plaintiff.  Burdine, 450 U.S. at 255.  The burden then shifts back to the plaintiff to establish that the employer's proffered reason is merely a pretext for discrimination. Hutson, 63 F.3d at 777.  At all times, the plaintiff bears the burden of persuading the trier of fact that intentional discrimination occurred.  Id.

The district court granted summary judgment in favor of LOL because it determined that Reynolds failed to provide "additional evidence" that age was a factor in his termination. For the purpose of this appeal, we will assume that Reynolds has made the required "additional showing" that age was a factor in his termination. However, we affirm the decision of the district court because even if Reynolds presented a prima facie case of age discrimination, he failed to establish that LOL's RIF was a mere pretext for discrimination.

Reynolds raises several factual issues which he claims sufficiently establish that the RIF was a pretext for age discrimination. First, Reynolds asserts that inconsistent explanations of the manner in which the RIF was to be implemented show a discriminatory animus toward Reynolds. Specifically, he asserts management decided to implement the RIF by geographic region at the last minute as a way to include Reynolds in the RIF. LOL eliminated five MPS positions: one in each of the Western, Northwestern, and Dalbo regions and two in the Southeastern region. Reynolds points out that Don Berg stated in his deposition that to orchestrate the RIF, management would "just go to the date of hire. . . . It's just looking up dates." Reynolds reasons that if the vice president of procurement was unaware that MPS's were to be eliminated by region, the locational consideration must have been added at the eleventh hour to include Reynolds in the group to be terminated.[3] However, Reynolds fails to acknowledge the portion of Berg's deposition where he specifically mentioned the necessity of considering regions in the RIF:

---

[3]If LOL had considered the date of hire only in determining which MPS's to eliminate, Reynolds would not have been terminated in the RIF.

> We were experiencing a continual decline in milk volume, a continual decline in producer numbers and the first realization was that the declines in our business [were] <u>very different by geographical region</u>. . . . [T]he position we took is that we needed to remove or have a work force reduction that was <u>geographically sensitive</u> that would have a positive impact of removing unnecessary costs from our system. So we embarked on a program in 1993 in which we identified <u>how much resource needed to be deployed from each region</u> and announced by letter that those who wished to consider a voluntary layoff could come forth and if the numbers weren't hit we would have to go to a mandated layoff.

Berg Dep. at 22-23 (emphasis added). Berg recognized at the outset that the RIF would be implemented by region.

Reynolds asserts that pretext is especially pronounced because management failed to inform the MPS's that geography was one of the factors to be considered in the RIF. In fact, Reynolds claims that "a memo dated October 13, 1993 was provided to the MPS's setting forth the terms of the RIF without regard to geographical location." Reynolds's Br. at 34 (emphasis omitted). First, we note that seniority, see <u>Bright v. Standard Register Co.</u>, 66 F.3d 171, 173 (8th Cir. 1995) (per curiam), and geography, see <u>Smith v. Goodyear Tire & Rubber Co.</u>, 895 F.2d 467, 471-72 (8th Cir. 1990), are legitimate factors for businesses to consider when determining the manner in which to execute a RIF. We also feel compelled to point out that appellant blatantly misstates the record on this issue. The October 13, 1993 memorandum from Ray Cherry specifically notified the MPS staff that the RIF would be geographically sensitive:

> To adequately meet the needs of our Dairy Foods system we have determined that a reduction of Milk Production Specialists must take place within the following areas:
>
> *      Southeast Minnesota - 2 MPS positions
> *      Western - 1 MPS position

```
                *       Northwest Area - 1 MPS position
                *       Dalbo - 1 MPS position
```

Appellee's App. at Tab 6.  We do not know how Cherry could have more clearly stated that geographic regions would be considered in the RIF.  We conclude that LOL did not proffer geography as a mere pretext for discrimination.[4]  LOL's consideration of seniority[5] and geography as a means to determine which MPS's to eliminate in the RIF were business decisions which we will not second guess.  See Goodyear, 895 F.2d at 472.

In previous years, LOL had offered voluntary early retirement packages to interested and eligible employees.  At forty-five, Reynolds was the second oldest MPS at LOL.  Reynolds essentially argues that because he was not yet eligible for early retirement, LOL chose the most convenient way to eliminate him as part of a plan to flush older MPS's from the workforce.  However, an employer's offer of voluntary "early retirement to other protected employees does not violate the ADEA and does not support an inference of age discrimination."  Serben v. Inter-City Mfg. Co., 36 F.3d 765, 766 (8th Cir. 1994) (per curiam) (citing Gray v. New England Tel. & Tel. Co., 792 F.2d 251, 255 (1st Cir. 1986)), cert. denied, 115 S. Ct. 1402 (1995).  Therefore, LOL's previous offers of early retirement do not establish that the RIF was a pretext for discrimination.

_____

[4]Reynolds also asserts that LOL's pretextual motive is evident because the regions considered in the RIF were eliminated following the RIF.  However, the record indicates that regions were renamed and adjusted following the RIF rather than eliminated.  MPS's continue to work within specific regions.

[5]Reynolds argues that because LOL did not have a bona fide seniority system in place, see 29 U.S.C. § 623(f)(2)(A) (1994), it violated the terms of the ADEA.  However, section 623(f)(2)(A) applies only when an employer seeks to establish the existence of a bona fide seniority system to otherwise avoid liability under the ADEA.  See id.  LOL does not claim to have a bona fide seniority system in place.  It merely implemented the RIF in question using years of service as one neutral, nondiscriminatory factor in determining which employees to eliminate.  See Bright, 66 F.3d at 173.

-8-

In 1990, LOL implemented a marketing plan to attract milk producers who were likely to remain in the milk production industry for a substantial period of time. The "ideal producer" is forty-four years of age or younger, a production manager, has more than one hundred cows, and produces more than one million pounds of milk per year. Reynolds conceded at oral argument that marketing a product or business to a particular age group is acceptable and commonly practiced. However, Reynolds asserts that by targeting younger producers, LOL created an age sensitive environment, where older age was considered a negative characteristic. For example, MPS's referred to milk producers who were likely to remain in the business for a long period of time as "survivors," while milk producers who were not likely to persevere were referred to as "nonsurvivors." Reynolds contends that the negative attitude toward older milk producers seeped into the work environment and became directed toward older MPS's. Therefore, the RIF was merely a pretext for discriminatorily ousting Reynolds, the second oldest employee, from the workforce. We disagree. First, the terms "survivor" and "nonsurvivor" were slang terms developed by the MPS's, not management. Second, there is no evidence that LOL management believed that MPS's had to fall within the age range of the "ideal producer" to be able to attract the "ideal producer." The record does not indicate that LOL's marketing plan played any role at all in determining which MPS's to terminate.

Reynolds asserts that Don Berg and Ray Cherry referred to him as an "old fart" two or three times over a nine-year period. Reynolds also heard Berg and Cherry refer to other workers as "old

farts" on several occasions over the same nine-year period. Reynolds contends that these remarks are sufficient to establish pretext. In Hutson, we stated that at the pretext stage of the McDonnell Douglas burden-shifting analysis "some causal relationship is necessary to demonstrate the significance of non-contemporaneous statements, or statements made by persons other than the relevant decision-maker, to the resolution of the ultimate issue of intentional discrimination." Hutson, 63 F.3d at 779 (emphasis in original). Berg and Cherry referred to Reynolds as an "old fart" two to three times over a nine-year period. Even viewing the record in the light most favorable to Reynolds, we have no reason to believe any of those references were made contemporaneously to the decision to reduce staff. As for the statements directed toward other employees, Reynolds stated in his deposition that he could not remember who the statements were directed to, where they were made, or how many times Cherry or Berg referred to other employees in such a manner. Reynolds has failed to establish a causal relationship between those statements and his termination. Because these statements were stale and unrelated to the decision-making process, we conclude that they were "stray remarks," insufficient to establish pretext. See Aucutt, 85 F.3d at 1315-16.

Reynolds further contends that LOL's failure to rehire him in accordance with company policy establishes pretext. Reynolds asserts that LOL "transferred" other MPS's eliminated in the RIF to other positions within the company but did not afford Reynolds the same treatment. However, it is undisputed that LOL's rehire policy requires former employees to actually apply for other positions within the company to be eligible for the rehire preference. MPS's who moved to other positions within the company applied for those positions. Reynolds only applied for one position at LOL following his termination. He applied for a case dock worker position at

LOL's Sioux Falls Plant.  LOL hired David Hoop to fill the opening.  Hoop had fifteen years of experience with a dairy in Phoenix performing essentially the same duties as a case dock worker.  At the time he was hired, Hoop was employed as a part-time case dock worker for LOL.  Reynolds, on the other hand, did not have experience performing the duties required of a case dock worker.  This was the only position Reynolds applied for at LOL after he was transferred.

Ray Cherry informed Reynolds of two open positions, one in Cottonwood, Minnesota and one in Poland.  Reynolds did not apply for either position.  LOL retained Reynolds as an MPS from the date he was notified of his termination, October 22, 1993, until January 14, 1994.  During that twelve-week time period, LOL allowed and encouraged Reynolds to spend 60% of his on-the-job hours searching for employment opportunities.  During that time period, Reynolds also had free access to the LOL posting board on which available positions were listed.  Overall, the evidence does not establish that LOL failed to rehire Reynolds because of a discriminatory motive.  Rather, it suggests that LOL did not rehire Reynolds because he did not exert sufficient efforts to gain reemployment with the company.

Reynolds contends that Harlan Heidebrink, a procurement manager at LOL, told him that age "might have been a playing factor" in his termination.[6]  Heidebrink did not give a deposition

---

[6]Reynolds also asserts that Tim Raasch and Jamie Kulesa told him age may have been a factor in his termination.  However, Reynolds acknowledges that these statements are merely opinions and neither Raasch nor Kulesa was a decision-maker in his termination.  Such opinions by nondecision-makers are insufficient to establish pretext.  Furthermore, in his deposition, Raasch stated that he believed the terminations were based on seniority and did not mention the possibility that Reynolds's age could have been a factor.

in this case.  However, most of the other decision-makers, including Cherry, Berg, Steve Sneer, and Jeff Johnson, stated in their depositions that within the separate regions, years of service with the company was the only factor considered.  We first note that Reynolds's report of Heidebrink's statement appears to be an inadmissible hearsay statement, which standing alone, "may not defeat a summary judgment motion." Fireman's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993). Combined with the other evidence in the case, Heidebrink's alleged statement is not sufficient to establish pretext and overcome LOL's motion for summary judgment.

Reynolds's evidence viewed cumulatively, does not establish that LOL's RIF was a mere pretext for discrimination.  Of the five MPS's terminated in the RIF, three were under the age of forty, and Reynolds, at forty-five years of age, was the oldest.  LOL implemented a legitimate RIF and considered only neutral, nondiscriminatory criteria in determining which MPS's to eliminate.  Reynolds failed to present a genuine issue of material fact regarding pretext.  Therefore, the district court correctly granted LOL's motion for summary judgment.

### B.    Deceit Claim

Reynolds claims that LOL deceived him in violation of S.D. Codified Laws § 20-10-1.  Section 20-10-1 states that one is liable for deceit if he "willfully deceives another, with intent to induce him to alter his position to his injury or risk."  S.D. Codified Laws § 20-10-1 (Michie 1995).  Reynolds asserts that he was deceived by LOL management because they failed to inform him of available positions within the company. Because an employment

relationship was clearly established, section 20-10-1 required LOL to reveal facts to Reynolds which it was "bound to disclose." Moss v. Guttormson, 551 N.W.2d 14, 16 (S.D. 1996). Reynolds claims to have asked several LOL managers about possible job openings within the company.  On most occasions, the managers simply responded that they were not aware of any available positions. Reynolds claims that the managers intentionally deceived him by failing to inform him of employment opportunities as required under LOL's rehire policy.  However, the rehire preference did not require individual managers to have knowledge of all the possible job openings within LOL, nor did it create a duty for the managers to find out about job openings on Reynolds's behalf.  Reynolds should have and reportedly did inquire from Job Service[7] about potential employment opportunities.  Reynolds claims that in an eighteen-month period, Job Service did not give him a single application.  Yet in Reynolds's deposition, he admitted that he did not ask Job Service for a single application.  Ray Cherry and Scott Gottschalk informed Reynolds of a job opening in Cottonwood, Minnesota and a temporary position in Poland.  Yet Reynolds failed to apply for either of these positions.  In fact, during the eighteen-month period Reynolds searched for employment opportunities within LOL, he applied for only one position.  LOL hired a more experienced and more qualified part-time LOL employee to fill the opening.

Furthermore, Reynolds fails to present a genuine issue of material fact as to whether he detrimentally relied on LOL's rehire policy as required under section 20-10-1.  See Taggart v. Ford Motor Credit Co., 462 N.W.2d 493, 502 (S.D. 1990).  The following exchange occurred during Reynolds's deposition and shows that he did not rely to his detriment on the rehire policy:

---

[7]Job Service is an employment search service located in Brookings, South Dakota.

Q. When did you first start looking for another job?

A. Right after I got my notice.

                    \*      \*      \*

Q. Did you start looking outside of Land O'Lakes?

A. Yes.

Q. Tell me how you went about your job search efforts.

A. I went outside of Land O'Lakes. Not only inquired through the Land O'Lakes system with several people, but I went to Job Service. I registered myself at Job Service, which I checked every week for 18 months. I was in there every week checking for a job.

Reynolds Dep. at 80-81. Later Reynolds stated that he had sent out 150-170 job applications following his termination. Needless to say, it is unfortunate that Reynolds would have such difficulty finding reemployment after the RIF. However, Reynolds has not established that he relied on LOL's rehire policy to his detriment. The district court properly granted summary judgment on Reynolds's deceit claim.

## III. CONCLUSION

For the reasons stated above, we affirm the decision of the district court.

A true copy.

      Attest:

              CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT