**Don R. FREDREGILL, Plaintiff,**

v.

**NATIONWIDE AGRIBUSINESS INSURANCE COMPANY, a/k/a Farmland Insurance Companies, Defendant.**

**No. 4–95–CV–30745.**

United States District Court,
S.D. Iowa,
Central Division.

Dec. 11, 1997.

Anthony F. Renzo, Babich, McConnell & Renzo, Des Moines, IA, for Plaintiff.

Rebecca B. Parrott, Dickinson, Mackaman, Tyler & Hagen, Des Moines, IA, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WALTERS, United States Magistrate Judge.

Before the Court is defendant's motion for summary judgment. On October 24, 1995, plaintiff filed his complaint, alleging defendant failed to promote him in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111, et seq., demoted him in violation of the ADA and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq., breached an oral contract of employment and is estopped to deny a promised promotion. The claimed disability relates to plaintiff's obesity. Plaintiff seeks compensatory damages and other relief.

Jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343(a)(4) and 42 U.S.C. § 2000e–5(f)(3). The parties consented to proceed before a United States Magistrate Judge and the case was referred to the undersigned for all further proceedings on March 4, 1997. *See* 28 U.S.C. § 636(c).

On February 18, 1997, defendant filed its motion for summary judgment on all claims, along with a statement of undisputed facts, brief and exhibits. Plaintiff filed a resistance to defendant's motion on May 15, 1997, along with a response to defendant's material facts, brief and record of exhibits.[1] Defendant has replied.

Hearing was held on the motion on August 15, 1997. Plaintiff was represented by attorney Anthony Renzo. Defendant was represented by attorney Rebecca Boyd Parrott. Trial is scheduled to begin as the second case on January 26, 1998, with a firm trial date of January 11, 1999.

## I.

The standards for summary judgment are well known and the Court will not dwell on them at length. Defendant is entitled to summary judgment if the affidavits, pleadings, and discovery materials "show that there is no genuine issue as to any material fact and that [defendant] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In employment cases, the Eighth Circuit has cautioned courts that "summary judgment should seldom be used" because such cases "often depend on inferences rather than on direct evidence." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991)). *See also Webb v. St. Louis Post–Dispatch*, 51 F.3d 147, 148 (8th Cir.1995); *Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir.1995); *Kunzman v. Enron Corp.*, 902 F.Supp. 882, 892 (N.D.Iowa 1995). Still, summary judgment is not a disfavored remedy. *See Snow v. Ridgeview Medical Ctr.*, 128 F.3d 1201, 1205 (8th Cir.1997) ("summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case").

In its motion defendant argues that plaintiff cannot prove that Farmland regarded him as having a disability due to his obesity so as to recover under his ADA failure to promote claim, that the breach of contract claim is precluded by both the Iowa statute of frauds and Iowa contract principles, that plaintiff cannot prove any of the required elements of promissory estoppel, and that plaintiff has no evidence that he was regarded as having a disability or that age was a motivating factor in connection with his demotion. Plaintiff contends there are material factual issues on all counts which preclude the Court from granting summary judgment in the defendant's favor.

## II.

The following facts appear to be undisputed or are those viewed in the light most favorable to plaintiff. Where factual disputes are discussed, the Court has accepted

---

1. The record in this case consists of a bound group of numerically tabbed exhibits, affidavits and deposition excerpts filed by plaintiff and an index of similar tabbed materials filed by defendant. For purposes of this motion, they will be referred to as Pl.Ex. ___ and Def. Ex. ___, respectively, with the number referring to the tabbed materials.

the version favorable to plaintiff for the purposes of the pending motion.

Plaintiff Don R. Fredregill is an Iowa resident and an employee of Nationwide Agribusiness Insurance Co. a/k/a Farmland Insurance Companies (Farmland). Fredregill is 5′10″ and since 1982 his weight has ranged from 300 to 330 pounds. In June 1992 he weighed more than 100% over the norm for his height. Fredregill was 55 years of age in March 1995. Farmland is organized under the laws of Iowa and registered to do business in this state.

Michael R. Pesek is currently Farmland's President and Chief Operating Officer. From 1993 to October 1994 Pesek was employed as Vice President of Property and Casualty (P & C) Operations, where he was responsible for Farmland's underwriting, processing, loss control and pricing operations. Pesek left Farmland in 1994 and returned in March 1996 in his current position. Leonard Brunson was Director of the Loss Control Department until 1994 and served as plaintiff's supervisor for a period of time.

Plaintiff began working for Farmland in 1979 as an appraiser in the Loss Control Department (LCD). In 1981 he was promoted to Claims Adjuster. In 1983 he was promoted to the position of Training Coordinator in LCD. While there is some dispute about the exact language, when Fredregill was interviewing for this promotion, Allen Brousseau, Senior Vice President, told Farmland employee Dan Mauk that Fredregill needed to lose weight as a condition of getting the job. (Pl.Ex. 7, Affidavit of Mauk). Fredregill was promoted without any weight requirement. In 1985 plaintiff was promoted to Regional Manager in LCD. Plaintiff's ultimate goal within the company was to become Director of LCD when Leonard Brunson, his supervisor, retired.

In June 1992, Michael O'Laughlin, Vice-President of P & C Operations, discussed with plaintiff his goal of becoming Director of LCD and asked if plaintiff would agree to transfer into the position of Manager of Commercial Lines Underwriting (CLU). Plaintiff alleges O'Laughlin effectively promised him a promotion to Director of LCD if he transferred. Specifically, in a written narrative to the Iowa Civil Rights Commission Fredregill described the conversation as follows:

> He [O'Laughlin] said if I spent one or two years as the manager of CLU he would look very favorably upon my candidacy in replacing Leonard when he retired.

(Def. Ex. 1, at 2). There is no other indication from Fredregill in the record as to what O'Laughlin actually said. (Pl.Ex. 10, Dep. of Fredregill, at 6–7). His deposition testimony characterized the conversation as indicated below:

> ... In my mind, I had been promised that position when Leonard retired.

(*Id.* at 26).

> I believe the person directly responsible for hiring that position inferred to me that by taking a job, basically, that I was not too interested in, that I would be fully qualified to fill that position.

(*Id.* at 27).

> ... I felt like I had been promised the job.

(*Id.* at 42).

In his summary judgment affidavit, plaintiff states:

> I accepted the unwanted job of underwriting manager only because [O'Laughlin] assured me in so many words that if I agreed to transfer to underwriting I would be the next Director of Loss Control after Leonard Brunson retired.

(Pl.Ex. 9). About a month after this conversation, O'Laughlin left the company. No promises were made by any other Farmland employee. Fredregill has a recollection of discussing the O'Laughlin conversation with only one other employee, Ralph Gandy, who was his immediate supervisor at the time he subsequently applied to be the LCD Director. Fredregill did not recall the Gandy conversation other than that he told Gandy how much he wanted the job and that he thought he had an "inside track." (Pl.Ex. 10, Dep. of Fredregill, at 8).

Though he did not want it, O'Laughlin's comments led Fredregill to apply for the open position as CLU manager in the belief it would position him to replace Brunson. He was appointed to the position in August

1992. Manager of CLU was not a promotion for Fredregill; it was a lateral move. He stayed in the same pay band and received the same pay as he had as Regional Manager in LCD.

Twice in 1993, during discussions with Jerry Cooper about filling the vacancy left by Fredregill's move, Leonard Brunson, according to Cooper, made statements to the effect that he "didn't think that Don met the image that the company projected and that he would probably never go any further than where he was at." (Pl.Ex. 11, Depo. of Cooper, at 11). Cooper understood the reference to be to "weight," "neat and trim, nice suit." (*Id.*) Brunson was not Fredregill's supervisor at the time.

In May 1994 the position of Director of LCD came open. Fredregill and Jim Mack were the two principal candidates considered. In Fredregill's most recent performance evaluation he received a score which placed him in the "Meets" or middle range category. Fredregill had cross-training in loss control and underwriting. At the time, Mack held the position of Nationwide Columbus Operations Commercial Division and Loss Control Manager. In Mack's most recent performance evaluation, he received a total score placing him in the upper range of the "Above" category. Mack had also spent the prior two years in a position in which he was involved in a "re-engineering project" with Farmland's parent company. The project developed ways for managers to take a different perspective in improving business processes.

The Director of LCD reported directly to Pesek, then Vice–President of P & C Operations. On April 15, 1994, Pesek interviewed Fredregill. He also consulted with Leonard Brunson, the former Director, and Forrest Kohler, Vice–President of Corporate Service. Pesek selected Mack for the position. Mack was not overweight. Pesek testified generally that Mack had philosophies and goals more in line with Pesek's goals for Farmland.

Pesek's two-page handwritten notes of his interview with Fredregill include certain notations in content and form as follows:

low key—not outgoing

not corporate image
designations—*Age*

(Pl.Ex. 3 at 2). In his deposition, Pesek testified the comments about corporate image and age originated with Fredregill. Fredregill was concerned about "dark suits or something" "coming from Nationwide," and was worried his age might be a problem. (Pl.Ex. 13, Depo. of Pesek, at 29–31). Pesek stated he told Fredregill these were not concerns. (*Id.*) Fredregill states he never referred to corporate image or age during the interview. (Pl.Ex. 9, Affidavit of Fredregill).

Later, in approximately July 1994, at a reception in Missouri, Brunson told Fredregill that his "problem" with upper management was his "weight." (Def. Ex. 1 at 2).

In late 1994 a decision was made to reorganize the underwriting department, which required reducing the number of CLU managers from three to two. In October 1994 there were three managers for approximately 20 people, Fredregill, Mary Murphy and Jeff Arrandale. The decisionmakers in the downsizing decision were Lynda Barnes, Director of Property and Casualty Underwriting, and Ken Ridge. Ridge was Pesek's successor. Pesek had initiated the downsizing process before he was transferred to a national office, but otherwise was not directly involved in the decision who would remain as a manager. In January 1995 Ridge had a telephone conversation with Pesek in which the performance of the CLU managers was discussed. Ridge did not recall details other than Pesek did not have a strong opinion as between Fredregill and Arrandale.

Barnes had transferred from a position of "Director of Marketing and Administration" to Property and Casualty Underwriting in approximately October 1994 not long before Pesek left. Early on in Barnes' new position, the decision was made to change the "span of control" of the Property and Casualty Underwriting managers. Barnes' perception was that the decision to reduce the number of managers to two was "part of something that had already begun" prior to her appointment. In a memo to Ridge dated January 30, 1995, Barnes addressed the "span of control" issue, and the "cross distribution system assignments," which sought to align the

underwriting staff into contact with either Farmland staff or outside agencies and brokers. (Def.Ex. 5). Barnes recommended retaining Murphy and Arrandale as managers, based on their underwriting experience and technical abilities. (*Id.* at 3). Barnes decided not to retain Fredregill as one of the two managers because "Don Fredregill has value to Farmland as a well cross trained individual though his lack of technical desk underwriting experience was considered in this decision." (*Id.*) Arrandale was retained instead.

Fredregill has testified he believes he was better qualified than ·Arrandale because he had received a better performance evaluation, had more relevant experience, and had been with the company longer. In February 1995 plaintiff was advised that as of March 1995 he was being transferred out of his CLU Manager position and into the position of Independent Agency Underwriter (IAU). This transfer was a demotion in terms of job responsibilities and authority. The other underwriting manager retained, Mary Murphy, is missing one arm from the elbow down.

In his deposition, Fredregill admitted he was not aware of any derogatory statements by any Farmland employee relating to his age or age in general. Beyond the statements discussed above, the only other weight-related comments in the record are in the affidavit of Roger Thompson, a former Nationwide/Farmland employee. Thompson stated that in the 1989–90 time period, while Thompson and Forrest Kohler, Vice President of Corporate Service, were culling files for additional storage space, Kohler and Thompson read a note in the file of another employee stating "due to this man's weight we should dismiss him." Kohler reportedly

told Thompson "this is the stuff we have to get rid of." (Pl.Ex. 8). Thompson also recalls that in 1991–92 Loss Control Regional Manager Don Easter told him that Leonard Brunson had said Fredregill was "not Nationwide material because of his size." (*Id.*) Apart from the facts of his height and weight, there is no evidence plaintiff had any actual physical impairment.[2]

## III.

### A. *ADA Claims*

A stated purpose in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Under the ADA it is unlawful for an employer to

discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*Id.* § 12112(a); *see also id.* § 12111.[3]

ADA cases are analyzed under the same burden-shifting rules ·as Title VII cases, including the Civil Rights Act of 1991 modifications, 42 U.S.C. §§ 2000e–2(m) and 2000e–5(g)(2)(B). *Pedigo v. P.A.M. Transport, Inc.,* 60 F.3d 1300, 1301 (8th Cir.1995); 42 U.S.C. § 12117(a). Plaintiff may proceed under two alternate theories, pretext or mixed-motives, which determine allocation of the burdens of production and persuasion. *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993).

Plaintiff suggests that the 1991 Act did away with the familiar "mixed-motive" and

---

**2.** The Court can find no clear statement in the summary judgment record as to plaintiff's current status, though his deposition implies that he remained employed at Farmland at the time of the deposition on March 27, 1996. (Pl.Ex. 10, Dep. of Fredregill, at 43, 57–59).

**3.** In the area of employment, the ADA required the Equal Employment Opportunity Commission (EEOC) to issue implementing regulations. The regulations are found at 29 C.F.R. Pt. 1630 and are followed by an appendix providing "interpretive guidance." The regulations and interpretive

guidance are frequently used by the courts in construction and application of the statute. In view of the congressional mandate, the regulations may be regarded as "substantive," thus having the force of law. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 295–96, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). The Court has in any event carefully considered the pertinent regulations and.interpretive guidance in connection with this ruling. *See School Bd. of Nassau County v. Arline,* 480 U.S. 273, 279–80, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

"pretext" analytical distinction in Title VII cases, essentially merging the latter into the former. Because ADA and Title VII claims are analyzed in the same manner, he believes the Court should approach his ADA claim as a mixed motive (or "motivating factor") case. This is a serious issue, but it is not necessary to answer the question on the present motion because on the ADA claims the motion addresses itself to the threshold question of whether plaintiff has a "disability" within the meaning of the ADA.

Under the ADA the term "disability" has three alternative definitions: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(2); *see* 29 C.F.R. § 1630.2(g). A physical impairment includes any "physiological disorder, or condition" which affects one of the major "body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine ...." 29 C.F.R. § 1630.2(h)(1). "Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i). The phrase "substantially limits" means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* 1630.2(j)(1).

When evaluating the major life activity of "working" the EEOC regulations add that [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The

inability to perform a single, particular job does not constitute a substantial limitation ....

*Id.* § 1630.2(j)(3)(i). In addition to the factors listed above the following factors may also be considered:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Id.* § 1630.2(j)(3)(ii).

The phrase "regarded as having such an impairment" as used in the third alternate definition of a disability means:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by [an employer] as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in... this section but is treated by [an employer] as having a substantially limiting impairment.

29 C.F.R. § 1630.2(1).

■ Obesity alone is generally not a disability. *See Francis v. City of Meriden,* 129 F.3d 281, 286 (2nd Cir.1997) ("Generally weight is not ... an impairment [under the ADA]"); *Andrews v. Ohio,* 104 F.3d 803, 808–10 (6th Cir.1997) (indicating that unless tethered to a substantially limiting physical impairment, obesity is simply a "physical characteristic" beyond the reach of the

ADA); *Nedder v. Rivier College,* 908 F.Supp. 66, 75–76 (D.N.H.1995) (cases indicate "obesity alone does not constitute a disabling impairment as defined under the ADA"); *Smaw v. Commonwealth of Virginia Dep't of State Police,* 862 F.Supp. 1469, 1475 (E.D.Va. 1994) ("the case law and the regulations both point unrelentingly to the conclusion that a claim based on obesity is not likely to succeed under the ADA"); 29 C.F.R. Pt. 1630 App. (§ 1630.2(i)) ("except in rare circumstances, obesity is not considered a disabling impairment"). People come in different shapes and sizes. A large segment of the population is obese to some degree, and obesity is a matter of degree. It is a mutable condition for some, immutable for others. It affects different people in different ways, sometimes not at all. Obesity may be the product or cause of physiological disorders or conditions, but it must relate to a physiological disorder or condition to meet the statutory definition of disability as explained in the EEOC regulations and interpretive guidance. As with any claim of disability, an assessment of the individual person's circumstances is required. *See Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 (7th Cir.1995).

 It is not necessary to make that assessment in this case because Fredregill is not disabled by his obesity. He "does not maintain that his obesity was in fact an impairment which substantially limited one of his major life activities." Plaintiff's Brief, at 19. Instead, Fredregill argues there is a genuine issue of material fact as to whether his employer regarded him as having a substantially limiting impairment. The relevant major life activity is "working" because there is no claim Farmland viewed Fredregill as limited in any other way.

Pesek's interview note and the statements attributed to Brunson concerning Fredregill made before and after the interview, indicate there is a genuine issue of fact as to whether a factor in the decision not to promote Fredregill was the belief he was "not corporate image." The jury could find that, in context, this statement was a euphemism for plaintiff's weight, in other words, he did not fit the corporate image because of his weight.

The "regarded as" prong of the disability definition refers to being regarded as having "a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual" as stated in the first prong of the definition. 42 U.S.C. § 12102(2)(A). It is not enough that Farmland perceived Fredregill was obese or took an employment action because he is obese. He must establish both components which inhere in the definition: that Farmland regarded him as having (1) a physical impairment within the meaning of the ADA, which (2) substantially limited him in working.

The first component is satisfied if Fredregill has an actual physical impairment, or if not impaired, was treated as if he had such an impairment. *See* 29 C.F.R. § 1630.2(*l*)(1)-(3). Plaintiff appears to assume his height and weight in comparison with the norm is sufficient proof of an actual physical impairment. He directs his argument to the question of whether Farmland treated the impairment as substantially limiting his ability to work.

Plaintiff's height and weight objectively establish he is very overweight, but that does not necessarily support the conclusion he in fact has a physical impairment in the required sense of a physiological disorder or condition which affects a body system. *Francis,* 129 F.3d at 285. If the matter depends on Farmland's perception, evidence which consists only of a belief that a physical characteristic presents an undesirable image or appearance does not support an inference that Farmland regarded Fredregill's weight problem as connected to a physiological disorder or condition. *See Andrews,* 104 F.3d at 808; 29 C.F.R. § 1630.2(h)(1).

There are not many perceived disability cases involving obesity, but most cases cite to *Cook v. State of Rhode Island Dep't of Mental Health, Retardation and Hospitals,* 10 F.3d 17 (1st Cir.1993). It illustrates the point. There plaintiff, who had applied for an institutional attendant position, was not hired because the defendant believed her morbid obesity limited her mobility and heightened the risk of heart disease and resulting workers' compensation claims. *Id.* at 23. The defendant's concern about func-

tional impairment and health risk showed "conclusively that [defendant] treated plaintiff's obesity as if it actually affected her musculoskeletal and cardiovascular systems." *Id.* Plaintiff had been treated as if she was impaired. There is no evidence like that here, only that Farmland viewed Fredregill's weight as inconsistent with its corporate image. Nothing indicates Farmland believed Fredregill's obesity would interfere with the performance of the functions of the LCD Director job, had interfered with his employment in other capacities, or posed a risk to Fredregill or others. The record, therefore, does not support an inference that Farmland "believed, however erroneously, that [he] suffered from an 'impairment' that, if it truly existed, would be covered under the statutes...." *Francis,* 129 F.3d at 285 (citing *Andrews,* 104 F.3d at 810).

While there is no substantial evidence that Farmland perceived Fredregill as having a physical impairment, the question is closer with respect to the sufficiency of the evidence to establish an actual physical impairment. To state the obvious again, there are many degrees of obesity. Fredregill has been 100% or more above what his body weight should be. His weight departs from the norm to such an extent it would not be beyond the realm of reason for the jury to conclude solely from his physical stature that his condition is an actual physical impairment. *See* 29 C.F.R. Pt. 1630 App. (§ 1630.2(h)) ("The definition of the term "impairment" does not include physical characteristics such as ... weight ... that are within 'normal' range and are not the result of a physiological disorder"). There is a range between mild obesity, which is not by itself an impairment, *see Andrews,* 104 F.3d at 810 (highway patrol officers who exceeded a specified weight limit) and the type of morbid obesity in *Cook* (5'2", 320 pounds).[4] This case is closer to the *Cook* end of the scale and in such cases the benefit of the doubt on the factual basis for an actual impairment ought to go to plaintiff.

■ The dispositive issue on Fredregill's ADA claim is whether Farmland viewed him as substantially limited in working. The Eighth Circuit has adhered to the EEOC regulation, which bears repeating:

> A person is substantially limited in the major life activity of working if [the person] is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(I).

*Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 487 (8th Cir.1996); *see Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1319 (8th Cir.1996). The statute's use of "limiting adjectives" such as "major" and "substantially" is intended to convey the sense that an actionable impairment must work a "significant reduction in a person's real work opportunities." *Webb,* 94 F.3d at 488; *see Wooten v. Farmland Foods,* 58 F.3d 382, 386 (8th Cir. 1995). Accordingly, "'working' does not mean working at a particular job of that person's choice." *Wooten,* 58 F.3d at 386; *see Gerdes v. Swift–Eckrich, Inc.,* 125 F.3d 634, 637 (8th Cir.1997); *Smith v. City of Des Moines,* 99 F.3d 1466, 1474 (8th Cir.1996); 29 C.F.R. § 1630.2(j)(3)(i) ("the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working"). "An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Wooten,* 58 F.3d at 386 (*quoting Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995)).

Viewing the evidence favorably to Fredregill, he was not promoted to the senior management position of Director of LCD in part because his weight was not consistent with what Mr. Pesek felt to be the corporate image. Pesek is now president of Farmland and his attitude may effectively prevent Fredregill from obtaining another senior management position. At the time of the

---

**4.** Cook did not rely on her size alone. She presented evidence her weight was related to dysfunction of both her metabolic system and

"neurological appetite-suppressing signal system." *Id.* at 23.

promotion decision Fredregill had worked fifteen years for Farmland. He always weighed about the same. When he was promoted to Training Coordinator in 1983 a requirement that he lose weight was considered and rejected. Fredregill received performance evaluations indicating he met company expectations and he was promoted to a regional manager position in LCD. According to Fredregill, he was solicited for the lateral transfer to a position as an underwriting manager and told it would aid him in achieving his career goal. Another was promoted, but Fredregill continued to be rated as a valuable employee. He has been rated above average in a number of categories, including "leading and influencing" in which the comment was made that he has "good people skills." (Pl.Ex. 1, at Doc. No. 119). The record reflects Farmland has consistently regarded plaintiff as being a good communicator and as working well with others.

The decision to retain Arrandale as an underwriting manager and demote Fredregill to the underwriter position was made by different decisionmakers, Lynda Barnes, Director of Property and Casualty Underwriting, and Ken Ridge, who had succeeded Pesek. There is no evidence that Barnes or Ridge regarded Fredregill's weight as substantially limiting his ability to work as an underwriting manager, indeed, there is no evidence they considered Fredregill's weight at all in making the decision. Barnes wrote to Ridge that Fredregill was a valuable employee with a cross-functional background and recommended he be retained in a loss control position, if available, or in an underwriting position. (Def. Ex. 2, at 3).

Fredregill suggests Barnes' decisionmaking was tainted by the fact she was hired by Pesek and had discussed the reorganization process with him prior to his departure. Barnes, however, testified that while she had discussions with Pesek about the strengths and capabilities of their underwriting managers, these were before the selection process had begun and Pesek made no recommendations who should be retained as managers under the reorganization. Ridge testified Pesek did not have a strong opinion about who was retained.

That Fredregill was disqualified from the job of his choice is not sufficient to establish a perceived substantial limitation in the ability to work. *Wooten,* 58 F.3d at 386; *see Tudyman v. United Airlines,* 608 F.Supp. 739, 745 (D.C.Cal.1984). Potential disqualification because of his appearance from other unspecified senior management positions he might want to explore at Farmland in the future is likewise insufficient. The evidence does not make the case that Farmland regarded Fredregill as disqualified from "a broad class or broad range of jobs." *Gerdes,* 125 F.3d at 638.[5] In fact it is to the contrary. Fredregill had a lengthy work history with Farmland in different capacities and different levels of responsibility. He worked his way up the ladder. In the process he acquired considerable experience and training in underwriting and loss control. He received solid performance evaluations and enjoyed the good opinion of those who have worked with him. In short, Farmland employed Fredregill in a variety of different insurance jobs in which he appears to have met Farmland's performance expectations. This is inconsistent with any reasonable inference that Farmland treated Fredregill as if he had a impairment which substantially limited him in his ability to perform work.

The Americans with Disabilities Act is important civil rights legislation which serves a high public purpose as stated in the congressional findings which precede the substantive provisions. 42 U.S.C. § 12101(a), (b). It is different from most other civil rights laws in that it is not always obvious whether a person is in the protected class. The statute and implementing regulations define the term disability to incorporate those persons who have physical or mental impairments

---

**5.** The Court does not believe the class of jobs must be of any particular breadth to be relevant. A "class," however, must be involved. "Class" refers to the "number and types of jobs utilizing similar training, knowledge, skills or abilities within [the relevant] geographical area from which the individual is also disqualified because of the impairment . . . ." 29 C.F.R. Pt. 1630 App. (§ 1630.2(j)). There is not much in the record to permit determination of a pertinent class here, but it is something other than a few select jobs at a single employer.

which truly limit the significant aspects of daily life others take for granted, or are seen to have such impairments. The definition is broad, but it is also carefully stated. It is incumbent on courts to faithfully adhere to the intended scope of the statute so that it does not become "a catch-all cause of action for discrimination based on appearance, size, and any number of other things far removed from the reasons the statutes were passed." *Francis*, 129 F.3d at 285–86; *see Andrews*, 104 F.3d at 810. If the ADA is construed to permit this, the clarity of the national mandate Congress intended will lose its focus and the achievement of its purpose will ultimately be impeded. *See Forrisi v. Bowen*, 794 F.2d 931, 934 (4th Cir.1986)(a Rehabilitation Act case (29 U.S.C. § 794) citing *Jasany v. United States Postal Serv.*, 755 F.2d 1244, 1249 (6th Cir.1985)). The treatment of Mr. Fredregill because he did not fit the corporate image may have been most unfair, but it did not violate the ADA unless he was an individual with a disability. The Court concludes plaintiff has not presented sufficient evidence from which the trier of fact could conclude he had a disability within the meaning of 42 U.S.C. § 12102(2).

## B. *Breach of Contract Claim/Promissory Estoppel*

■ Plaintiff claims his June 1992 conversation with Michael O'Laughlin resulted in a contract or enforceable promise that he would be promoted to the position of Director of LCD if he would transfer to underwriting. Defendant's motion challenges the contract claim on the basis of statute of frauds [6] and the sufficiency of the statements attributed to O'Laughlin as a basis for a cause of action on contract or promissory estoppel.

■ The existence of an oral contract and its breach are ordinarily factual questions.

*Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162, 165 (Ia.App.1993). Only a "reasonable certainty" is required. However, "the terms must be sufficiently definite to determine with certainty the duties and obligations of each party." *Id.* (citing *Burke v. Hawkeye Nat'l Life Ins. Co.*, 474 N.W.2d 110, 113 (Iowa 1991)). Vague promises do not suffice. *Burke*, 474 N.W.2d at 113.

The evidence of the terms of the contract is in plaintiff's narrative to the Iowa Civil Rights Commission which in full context stated:

> The next morning I made an appointment to meet with Michael O'Laughlin the Vice President of P & C Operations who was in charge of both departments. I told him my ultimate goal with FIC was to become the Director of LCD when Leonard Brunson retired in a couple of years.

> He said if I spent one or two years as the manager of CLU he would look very favorably upon my candidacy in replacing Leonard when he retired. I went to Human Resources Department and applied for the underwriting position. I was given an appointment to interview for the job but I was the only person she was interviewing and when would it be convenient to start. I felt that I had to take the job or I would not be offered any further opportunities of promotion within the company.

(Def. Ex. 1 at 2). The statement by O'Laughlin that he would "very favorably" look on plaintiff's candidacy for promotion after a period of time in another position is not sufficiently definite to allow the factfinder to determine with reasonable certainty what duties Farmland undertook by the statement, if it undertook any at all. Indeed, the language attributed to O'Laughlin is on its face short of a promise by Farmland to promote to the exclusion of other candidates and refers only to O'Laughlin's viewpoint.

---

6. It is not necessary to address the statute of frauds issue at length. Farmland argues, somewhat inconsistently, that O'Laughlin's alleged promise to look favorably on Fredregill's candidacy in one or two years was sufficiently concrete with respect to the time of performance so as to implicate the statute of frauds evidentiary rule barring evidence of unwritten contracts not to be performed within one year of making.

Iowa Code § 622.32. The Court believes the temporal element is as vague as the other terms of the alleged contract. If there was a contract it could have been performed within a year if Leonard Brunson retired early or died, thus precluding application of the statute of frauds. *See Shearon v. Boise Cascade Corp.*, 478 F.2d 1111, 1115 (8th Cir.1973).

■ Promissory estoppel, under Iowa law, requires a showing of "(1) a clear and definite oral agreement, (2) proof that the party urging the doctrine acted to his detriment in relying on the agreement, and (3) finding that the equities support enforcement of the agreement." *Bradshaw v. Wakonda Club,* 476 N.W.2d 743, 748 (Ia.App.1991). As in the case of the contract claim, the statements attributed to O'Laughlin are facially insufficient to permit a finding of a clear and definite oral agreement by Farmland.[7]

Defendant is entitled to judgment as a matter of law with respect to the counts claiming breach of contract and promissory estoppel.

## C. *ADEA Claims*

■ The final claim made by plaintiff is that defendant discriminated against him on the basis of his age when he was demoted from CLU manager to Independent Agency Underwriter in 1995. Defendant's motion challenges the ultimate issue of whether the record is sufficient to show plaintiff's age was a motivating factor in the decision to demote him.

■ Both the *McDonnell Douglas/Burdine* and *Price Waterhouse* theories of burden-shifting apply in ADEA cases, although without the limitations on relief set out in the 1991 amendments to the Civil Rights Act. *Reynolds v. Land O'Lakes, Inc.,* 112 F.3d 358, 361 (8th Cir.1997)(pretext case); *Nitschke v. McDonnell Douglas Corp.,* 68 F.3d 249, 253 (8th Cir.1995)(plaintiff did not meet burden in order to rely on mixed-motives analysis); *see* 29 U.S.C. §§ 623(a)(1), 626(b) & (c)(2)(incorporating remedy provisions of Fair Labor Standards Act, not Civil Rights Act). The elements of a *prima facie* ADEA case include a showing that "(1) [plaintiff] is within the protected age group; (2) he met the applicable job qualifications; and" (3) he suffered adverse employment action. *Reynolds,* 112 F.3d at 361 (citing *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 776

(8th Cir.1995)). In a reduction-in-force case, "plaintiff must also 'provide some "additional showing" that age was a factor in the termination.'" *Reynolds,* 112 F.3d at 361. Once the *prima facie* case has been made, "the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions." *Miners v. Cargill Communications, Inc.,* 113 F.3d 820, 823 (8th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 441, 139 L.Ed.2d 378 (1997)(citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If the employer does this, then the burden of production "shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for unlawful discrimination." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

In its motion, defendant does not attack plaintiff's prima facie case as such, but argues the evidence is insufficient to prove the ultimate issue of intentional discrimination on the basis of age in connection with the demotion decision. Farmland has put forward a legitimate non-discriminatory reason for selecting Arrandale over Fredregill for retention as an underwriting manager. Arrandale had more experience as a "desk underwriter" which "brings the technical expertise required to train underwriters, develop appropriate underwriting guidelines, and maintain adequate pricing policies." (Def. Ex. 2, at 3). Fredregill points to other factors he believes show he was the superior candidate. He had been at Farmland much longer, his latest performance rating was marginally better than Arrandale's, Arrandale's underwriting management experience was more in personal lines which Farmland had done away with, Fredregill had better people skills and was more trusted by field personnel, and Arrandale had shown difficulty in making decisions and tardiness in submitting performance reviews.

■ Rejection of the employer's proffered non-discriminatory reason permits, but

---

7. While defendant does not use it as a ground for summary judgment, the Court notes plaintiff's acceptance of another position in the company with no accompanying loss of benefits is insufficient consideration under Iowa law to give con-

tractual effect to an oral promise to promote. *See Rouse v. Boehringer Mannheim Corp.,* 108 F.3d 859, 860 (8th Cir.1997); *Albert v. Davenport Osteopathic Hosp.,* 385 N.W.2d 237, 238–40 (Iowa 1986).

does not require, the trier of fact to infer discrimination. *Hicks,* 509 U.S. at 511. The law in this circuit continues to evolve in light of *Hicks.* In *Rothmeier v. Investment Advisers, Inc.,* 85 F.3d 1328, 1336–37 (8th Cir. 1996), the court announced:

> ...[T]he rule in this Circuit is that an age-discrimination plaintiff can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision. The second part of this test sometimes may be satisfied without additional evidence where the overall strength of the prima facie case and the evidence of pretext "[s]uffices to show intentional discrimination." The focus, however, always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of the plaintiff's age.

The court has recently reaffirmed this rule. *Kneibert v. Thomson Newspapers, Mich., Inc.,* 129 F.3d 444, 456, (8th Cir.1997); *see Madel v. FCI Marketing, Inc.,* 116 F.3d 1247, 1251 (8th Cir.1997); *Ryther v. KARE 11,* 108 F.3d 832, 837–38 (Lay, J., majority) and 848 (Loken, J., concurring in part and dissenting in part) (8th Cir.1997) (en banc), *cert denied,* —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997). In *Ryther* a majority of the circuit judges in the Eighth Circuit adopted that portion of Judge Loken's opinion which also expressly confirmed that "*Rothmeier* is the law of this circuit." *Ryther,* 108 F.3d at 848 (Loken, J.)[8]. The Court believes this is a case in which the evidence is insufficient for the jury to infer age discrimination notwithstanding disputed evidence on the issue of pretext. *See Rothmeier,* 85 F.3d at 1335; *Walton v. McDonnell Douglas Corp.,* 981 F.Supp. 1273, 1275–76 (E.D.Mo.1997).

The evidence does not indicate that the decisionmakers who made the demotion decision, Barnes and Ridge, harbored any age-based discriminatory animus. Fredregill testified he was not aware of any derogatory statements by any Farmland employee relating to either his age or age in general. It follows there is no evidence of a "corporate atmosphere hostile to older employees." *Madel,* 116 F.3d at 1252. The only specific age-related evidence is the fact Pesek wrote the word "age" in his notes during Fredregill's earlier interview for the LCD Director position. Arguably, the word can be connected in context with the notation that Fredregill was "not corporate image." If this is some evidence of age bias on Pesek's part, it does not, standing alone as it does, permit an inference that other decisionmakers harbored the same bias. Pesek initiated the reorganization of the underwriting department. The record indicates, however, that he did not have significant involvement in deciding who would be retained. He had left by that time and been replaced by Mr. Ridge. There is no testimony that Pesek discussed plaintiff's age or age-related topics with Barnes or Ridge. Pesek was thus a nondecisionmaker with respect to the demotion decision. His earlier age notation was not in connection with that decisional process. The notes therefore do not provide direct evidence of a discriminatory age-based animus involving the reorganization. *See Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991) (quoting Justice O'Connor's observation in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) that "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process itself" are not direct evidence of discrimination.)

The evidence of pretext does not call into question the fact that Arrandale had the greater technical desk underwriting experience, but rather, Farmland's subjective assessment of the relative qualifications of Arrandale and Fredregill as competitors for the remaining underwriting manager position. A factfinder's belief Fredregill was the better candidate does not support an inference age was a determining factor. It is not for the courts to simply "second-guess an employer's personnel decisions." *Hanebrink v. Brown Shoe Co.,* 110 F.3d 644, 646 (8th Cir.1997);

---

8. Judge Loken dissented except for the part in which the quoted language is found, Part I.A, which is a "partial separate concurrence." 108 F.3d at 848.

*see Herrero v. St. Louis Univ. Hosp.,* 109 F.3d 481, 485 (8th Cir.1997). The evidence, viewed in its entirety, must permit a reasonable inference that age was a determinative factor in the decision to demote Fredregill. *Rothmeier,* 85 F.3d at 1336–37. Pesek's age notation is the essential evidence on which the ADEA claim rests. When it is viewed in context and in light of the absence of any other probative evidence suggesting age was a factor, there is insufficient evidence to create a genuine issue of fact as to whether Fredregill was discriminated against on the basis of his age.

### IV.

In view of the foregoing, the Court concludes defendant's motion for summary judgment should be granted as to all counts of the Complaint. The Clerk shall enter judgment of dismissal.

Motion granted.

IT IS SO ORDERED.