PUBLISH

UNITED STATES COURT OF APPEALS

Filed 5/1/96

TENTH CIRCUIT

---

ROBERT S. FURR, LESLIE WOOSLEY,
BERNARD E. OZINGA,

     Plaintiffs - Appellees,

vs.

SEAGATE TECHNOLOGY, INC.,

     Defendant - Appellant.

No. 95-6181

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-93-939-R)

---

Gary C. Pierson (Tony G. Puckett and Rochelle L. Huddleston with him on the brief), of
Lytle Soulé & Curlee, Oklahoma City, Oklahoma, for Defendant-Appellant.

Mark Hammons of Hammons & Associates, Oklahoma City, Oklahoma, for Plaintiffs-
Appellees.

---

Before BALDOCK, McWILLIAMS and KELLY, Circuit Judges.

---

KELLY, Circuit Judge.

---

     Plaintiffs-Appellees Robert S. Furr, Leslie Woosley, and Bernard E. Ozinga allege

that their employment with Defendant-Appellant Seagate Technology, Inc. was

terminated because of their age in violation of the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. §§ 621-34, and Oklahoma public policy.[1] The case was tried to a jury, which returned a verdict in favor of the Plaintiffs. Seagate filed a motion for judgment as a matter of law or a new trial, which was denied by the district court. This appeal followed.

## I.  Background

Seagate designs, manufactures and markets hard disk drives for computer systems. It has plants in 17 countries and over 30,000 employees worldwide. Seagate commenced operations in Oklahoma City on October 1, 1989, after purchasing an existing facility from another disk drive company. The Oklahoma City plant employed approximately 2,000 people.

In June 1991, Seagate's senior management determined that certain cost-containment measures would have to be taken to address an anticipated decline in profit margins. These measures included a company-wide reduction-in-force ("RIF"). The RIF was not undertaken as a desperate measure, but rather as a strategic business decision aimed at improving the company's position in the highly competitive hard disk drive market.

The initial RIF occurred in July 1991, with a second, smaller RIF in August 1991.

---

[1]    Plaintiffs concede that the intervening case of List v. Anchor Paint Manufacturing Co., 910 P.2d 1011 (Okla. 1996), disallows their state law claims. In List, the Oklahoma Supreme Court held that Oklahoma does not recognize a wrongful discharge claim predicated on Oklahoma public policy where the plaintiff has a statutory cause of action. Id. at 1013.

Approximately 1,200 employees were laid off from Seagate nationwide, including fifty-four from Oklahoma City.

Plaintiffs Furr, Woosley, and Ozinga were employed by Seagate at its Oklahoma City plant, and all three were ultimately selected for the RIF. All three worked in separate departments in a hierarchy of about 240 employees called Design Engineering headed by vice-president Miran Sedlacek. Design Engineering included a variety of diverse talents and disciplines, and the three Plaintiffs worked for different managers and performed vastly different jobs.

Mr. Furr, 53, was a senior drafter who performed electrical drafting. James Becker was Furr's immediate supervisor. Mr. Becker reported to Bill Diffin, Director of Engineering Services, who in turn reported to Mr. Sedlacek.

Mr. Woosley, 58, was an engineering support specialist who worked in the photo lab, photocopying artwork master prints for other employees to use in making printed circuit boards. Stan Young was Mr. Woosley's immediate supervisor. Mr. Young, like Mr. Becker, also reported to Mr. Diffin.

Mr. Ozinga, 62, was a senior consulting mechanical engineer who worked on the mechanical areas of disk drive design. David West, Director of Advanced Technology and Concepts, was Mr. Ozinga's immediate supervisor, and Mr. West reported directly to Mr. Sedlacek.

In early July, 1991, Mr. Sedlacek was informed about the planned RIF and was

told that the reduction would be 15% for his organization.  Mr. Sedlacek called a meeting of the five directors under him, including Mr. Diffin and Mr. West, and instructed them to cut 15% of the employees in their respective groups.  Mr. Sedlacek did not tell his directors who to select, nor did he personally select any employees for the RIF.

After the directors talked to their managers, and the managers and supervisors made their selections, Mr. Sedlacek held two meetings with all of his directors to discuss their selections.  The focus of these meetings was to ensure that the functions selected would cause the least harm to the company.

### A.  Mr. Furr's Selection

After meeting with Mr. Sedlacek, Mr. Diffin met with the five managers under him, including Mr. Becker and Mr. Young, to inform them of the RIF.  Mr. Diffin explained that each department would still have the same amount and type of work after the RIF and instructed his managers to select those that would least harm their department's ability to continue their operations.  Each manager was required to select only employees from his own department.  Mr. Diffin informed Mr. Becker that he would have to select two employees for the RIF.

Mr. Becker supervised 14 employees, 9 engineers and 5 technicians.  He determined that his two selections had to be from the technicians because the engineers could perform the work of the technicians, but the converse was not true.  Mr. Becker

- 4 -

then examined the tasks that each of the technicians was performing. Two were preparing printed circuit board layouts, another was performing several tasks, including new document production and photo lab and microfilm backup, and Mr. Furr and another technician, Modesto Adoptante, 58, were making engineering change orders and updating upgrades. In order to maintain people performing all of the various tasks, Mr. Becker selected one of the two technicians preparing circuit board layouts for the RIF and selected Mr. Furr over Mr. Adoptante. Mr. Becker testified that the selection decision was entirely his and that he kept Mr. Adoptante because he felt Mr. Adoptante was more productive than Mr. Furr. Mr. Becker based his selections exclusively on job elimination and productivity. After his layoff, Mr. Furr's job duties were performed by Mr. Adoptante and later absorbed by others in Mr. Becker's group; no one was transferred into Mr. Furr's former position or hired to take his place.

## B. Mr. Woosley's Selection

Mr. Young also learned of the RIF in the early July meeting with Mr. Diffin, and Mr. Diffin told Mr. Young that he would have to select one person for the RIF. Mr. Young selected a temporary employee who would eventually depart anyway. It was unclear at the time whether the termination of a temporary employee would count toward the RIF requirements. Although the temporary employee was approved for the July RIF, Mr. Young reviewed his department to determine who he would pick if another selection

was necessary.

Mr. Young's department consisted of nine employees, including the temporary. Three were scientists with degrees in chemistry; three employees, including the temporary, worked in the SMT lab; one independently operated the printed circuit lab; one maintained the specialized inventory of components used in the engineering department; and Mr. Woosley ran the photo lab. Mr. Young determined that the scientists, with their specialized knowledge, were indispensable, as were the employees operating the printed circuit lab and maintaining the specialized inventory. Mr. Young did not think that he could operate the SMT lab with only a single person (after losing the temporary), making the two remaining SMT lab employees vital. Thus, Mr. Young reasoned that Mr. Woosley was the next most expendable individual, behind the temporary, especially because other people under Mr. Diffin's management umbrella could, and had, performed Mr. Woosley's job in the photo lab.

Shortly after the July RIF, Mr. Diffin called a meeting of his managers, including Mr. Young, and announced that the group needed to lose another person. Mr. Diffin told Mr. Young that his department would lose the additional person, and Mr. Young agreed with that decision because every other department under Mr. Diffin had lost a permanent employee while he had only lost a temporary. Mr. Young selected Mr. Woosley, focusing exclusively on position elimination. Mr. Woosley's photo lab position was eliminated, although the photo lab duties still needed to be performed. A four-person, weekly

rotation was set up to handle Mr. Woosley's former photo lab responsibilities, and this rotation system lasted two years. No one was hired into Mr. Woosley's former position.

### C. Mr. Ozinga's Selection

Mr. West, Mr. Ozinga's manager, first learned of the RIF at the early July meeting with Mr. Sedlacek. Mr. West's organization consisted of eight specialized departments and developed integrated circuits. The technical employees in Mr. West's group were all electrical engineers, except Mr. Ozinga who was a mechanical engineer. Mr. Ozinga and one other consulting engineer reported directly to Mr. West.

Mr. West attempted to determine which specialities could be selected that would least impact his organization. He met with his managers and developed a RIF list, which included Mr. Ozinga because he was underutilized. Mr. West testified that as a mechanical engineer, Mr. Ozinga was an unnecessary luxury for his group, and he was unable to keep Mr. Ozinga busy, relying on other departments to provide work for him. In part due to his underutilization, Mr. Ozinga was considered a moderate to low performer, ranked among the bottom 15% of employees in Mr. West's department in performance.

Mr. West and the other directors under Mr. Sedlacek met with Mr. Sedlacek to discuss the people selected for the RIF. At that meeting Mr. West argued for the retention of some of his employees, including Mr. Ozinga. Mr. West succeeded in having one

employee, Mr. Jantz, 57, retained because there were other functions he could perform, but Mr. West could not convince the other managers to matriculate Mr. Ozinga into their departments. The other consulting engineer, five years older than Mr. Ozinga, was not selected for the RIF.

## II. Waiver

As an initial matter, Plaintiffs contend that Seagate has waived its right to appellate review by failing to include, among other things, the motion or brief for judgment as a matter of law, a new trial, or remittitur. "When the record on appeal fails to include copies of the documents necessary to decide an issue on appeal, the Court of Appeals is unable to rule on that issue." United States v. Vasquez, 985 F.2d 491, 494 (10th Cir. 1993). Seagate did include the entire trial transcript, as well as the district court's order denying its motion for judgment as a matter of law, or in the alternative, for a new trial, and for remittitur. Because Seagate's appeal is based upon challenges to the evidence and to the sufficiency of the evidence, this is a sufficient record to allow appellate consideration of the issues raised. See 10th Cir. R. 10.1.1, 10.3. In any event, Seagate supplemented the record on appeal with the motions and briefs, and we discern no prejudice to the appellees from this submission.

## III. Judgment As a Matter of Law

Seagate contends that it should have been granted judgment as a matter of law because Plaintiffs failed to present sufficient evidence to meet their burden of proving intentional age discrimination. We review the denial of a motion for judgment as a matter of law de novo. Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1363 (10th Cir. 1994). We construe the evidence and inferences most favorably to the nonmoving party. Id.

Seagate concedes that Plaintiffs met their initial burden of proving a prima facie case under the McDonnell Douglas standard. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Ingels v. Thiokol Corp., 42 F.3d 616, 621 (10th Cir. 1994) (setting out the prima facie elements in the reduction-in-force context). However, the existence of a prima facie case does not necessarily preclude judgment as a matter of law against the Plaintiffs. Cf. Ingels, 42 F.3d at 621-23. As we stated in Fallis v. Kerr-McGee Corp., 944 F.2d 743, 744 (10th Cir. 1991):

> [A]fter a full trial on the merits, the sequential analytical model adopted from McDonnell Douglas . . . drops out and we are left with the single overarching issue whether plaintiff adduced sufficient evidence to warrant a jury's determination that adverse employment action was taken against him on the basis of age.

Seagate has advanced a legitimate, nondiscriminatory reason for its decision to lay off the Plaintiffs, namely the company-wide reduction-in-force. The fact finder may only infer discrimination if the Plaintiffs produce evidence that the Defendant's proffered explanation is pretextual and unworthy of credence. Ingels, 42 F.3d at 621-22.

The Plaintiffs in this case attempted to prove discrimination by attacking the RIF as pretextual. Plaintiffs do not question the existence of a company-wide RIF, but they challenge the necessity of the RIF. Plaintiffs presented much evidence tending to show Seagate's financial health and profitability, including evidence that Seagate was hiring shortly before and after the RIF.

Plaintiffs' attempt to use Seagate's pre- and post-RIF hirings as evidence of pretext ignores the timing of the hirings. The uncontroverted testimony revealed that no one at Seagate's Oklahoma City plant learned of the RIF until late June 1991, a few weeks before it occurred. The fact that Seagate's managers were hiring before they learned of the RIF is irrelevant to proving that the RIF was pretextual. Accord Viola v. Phillips Medical Sys. of North America, 42 F.3d 712, 718 (2d Cir. 1994) (employee's first adverse performance review occurred on the eve of a RIF, but this was not evidence of pretext because the supervisor was unaware of the impending RIF at the time of the review).

Plaintiffs' evidence of Seagate's post-RIF hirings fails to show pretext because the people hired were not similarly situated to the Plaintiffs. The evidence reveals that Seagate did not hire anyone for two months after the RIF, and then after hiring a single 49-year-old for a job dissimilar to the Plaintiffs', did not hire anyone for another two months. Seagate did hire several people beginning in mid-November 1991, more than four months after the RIF, but Plaintiffs' evidence reveals that the newly hired individuals

were not hired into Plaintiffs' positions or positions comparable to theirs.[2]  Most of the newly hired individuals were hired for the direct labor pool, which was not subject to the RIF.[3]  The fact that a company is hiring accounting clerks shortly after reducing its engineering workforce does not indicate that the engineering RIF is pretextual.  Cf. Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 532 (10th Cir. 1994) ("To make a comparison demonstrating discrimination, the plaintiff must show that the employees were similarly situated.").

Plaintiffs attempted to attack the RIF as pretextual by challenging its necessity.  To that end, Plaintiffs presented much evidence tending to show Seagate's financial health and profitability.  However, as we have noted before, the wisdom of a RIF is not for a court or jury to decide.  A RIF is a business decision, and "[t]he ADEA is not a vehicle for reviewing the propriety of business decisions."  Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1426 (10th Cir. 1993).

Plaintiffs attempt to rely on Denison v. Swaco Geolograph Co., 941 F.2d 1416 (10th Cir. 1991), for the proposition that business judgment may be challenged by

---

[2]  Mr. Ozinga claims that a mechanical engineer was hired on July 15, 1991, but the evidence reveals that the person hired was actually a manufacturing advisory engineer, not a mechanical engineer.  There was no evidence that this position was similar to Mr. Ozinga's or that Mr. Ozinga was qualified for this position.

[3]  Seagate classified its employees as either "direct labor" or "indirect labor." Indirect labor included employees performing concept and design work, such as engineering. Direct labor included "hands on" type work, such as facilities maintenance.  It was undisputed that only indirect labor employees were at risk during the July 1991 RIF.

financial evidence. In <u>Denison</u>, the company attempted to justify Plaintiff's termination based on sales figures indicating that Plaintiff's division was less profitable than another. The Plaintiff showed this explanation unworthy of credence with evidence that neither the Plaintiff nor his replacement was involved in sales, the sales figures were not truly comparative, the company had strong financial potential, and the company considered the higher employment cost of older employees in deciding who to retain. The Plaintiff in <u>Denison</u> presented considerable evidence of pretext other than mere evidence of financial health. <u>Denison</u>, 941 F.2d at 1421. "'[T]his court will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives.'" <u>Faulkner</u>, 3 F.3d at 1427 (quoting <u>Lucas v. Dover Corp., Norris Div.</u>, 857 F.2d 1397, 1403-04 (10th Cir. 1988)). Financial evidence suggesting that a decision, in hindsight, may not have been prudent is not evidence of improper motive; the ADEA is not violated by erroneous or even illogical business judgment. <u>Cf.</u> <u>Sanchez v. Phillip Morris Inc.</u>, 992 F.2d 244, 247 (10th Cir. 1993) (Title VII case).

Plaintiffs also seek to infer pretext from the lack of a formal RIF plan and instructions. However, it was undisputed that the written RIF criteria were position elimination, performance, potential, and seniority, in that order. Further, the manner in which a company chooses to conduct a RIF is within the company's sound business discretion, and Plaintiffs have failed to adduce any evidence that the RIF criteria were a pretext for discriminatory motive. <u>Cf.</u> <u>Ingels</u>, 42 F.3d at 623 (company may alter the rules

it uses for conducting a RIF).

The Plaintiffs in this case produced statistical evidence purportedly showing a correlation between age and discharge. While statistical evidence may create an inference of discrimination, the evidence may be so flawed as to render it insufficient to raise a jury question. Fallis, 944 F.2d at 746. In this case, Plaintiffs' statistical evidence is so flawed because it failed to compare similarly situated individuals. Plaintiffs' statistics grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities. "'A plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals.'" Cone, 14 F.3d at 532 (quoting Fallis, 944 F.2d at 746) (emphasis in original). Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext. Rea v. Martin Marietta Corp., 29 F.3d 1450, 1456 (10th Cir. 1994).

Plaintiffs contend that Seagate used subjective criteria in selecting individuals for the RIF and that the use of subjective criteria creates an inference of discrimination. See Burrus v. United Telephone Co., 683 F.2d 339, 342 (10th Cir.), cert. denied, 459 U.S. 1071 (1982). Specifically, Plaintiffs take issue with the use of "potential" as a selection criteria. Plaintiffs argue that "potential" is subjective and that the use of "potential" as a criteria disparately impacts older employees. We find these contentions unpersuasive.

First, even if "potential" is somewhat subjective, the use of subjective criteria does not suffice to prove intentional age discrimination. Pitre v. Western Elec. Co., 843 F.2d 1262, 1272 (10th Cir. 1988). Second, any disparate impact that the use of "potential" may have is insufficient to state a claim under the ADEA because disparate impact claims are not cognizable under the ADEA. Ellis v. United Airlines, Inc., 73 F.3d 999, 1007 (10th Cir. 1996).[4] The plain language of the ADEA recognizes that disparate impact may be due to "reasonable factors other than age." 29 U.S.C. § 623(f)(1); see Ellis, 73 F.3d at 1008. Future job potential is certainly something that a company might legitimately want to consider in its RIF decision. Indeed, Congress has recognized potential as a legitimate factor distinct from age; Congress enacted the ADEA to combat "the setting of arbitrary age limits regardless of potential for job performance." 29 U.S.C. § 621(a)(2) (emphasis added). Simply because there may be a correlation between age and potential does not mean that potential cannot be used as a selection criteria. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 611-12 (1993).

Further, in this case, the uncontroverted testimony of the various managers who chose the Plaintiffs for the RIF shows that the managers looked only to job elimination and performance, not potential, in selecting the Plaintiffs. All three managers responsible for the terminations explained in detail why they believed Plaintiffs' positions were the

_____

[4] While disparate impact may be evidence of intentional discrimination in certain cases, Hiatt v. Union Pacific Railroad Co., 65 F.3d 838, 842 n.4 (10th Cir. 1995), Plaintiffs failed to present evidence that "potential," as interpreted by Seagate's managers, was correlated to age. See Rea, 29 F.3d at 1458.

- 14 -

least important to their departments, and there was no suggestion that "potential" ever entered into the decision. See Rea, 29 F.3d at 1458.

Plaintiffs contend that pretext can be inferred from the fact that not every department was subjected to the RIF. Specifically, Plaintiffs point to eight "predominantly younger" work groups under Sedlacek which were unaffected by the RIF. The undisputed testimony reveals that Sedlacek told his five subordinate directors to make selections from their departments for the RIF and that the individual directors then made their decisions after assessing the needs of their various groups. The fact that Sedlacek's managers choose to leave some work groups intact does not necessarily indicate pretext. Sedlacek's managers were asked to make business judgments as to which employees they could best do without, and the fact that some departments were unaffected may be a natural consequence of the greater perceived importance of certain departments. Plaintiffs have not produced any evidence indicating that the unaffected departments were similarly situated or performed identical functions to the affected departments, or that the departments were selected because of age. In the absence of any evidence of an illegal ulterior motive, courts and juries cannot presume to question the business judgment of company managers. See Faulkner, 3 F.3d at 1426; Sanchez, 992 F.2d at 247.

Plaintiffs claim that they were better qualified than other younger retained employees, allowing an inference of pretext. However, both Mr. Ozinga and Mr.

Woosley were selected for the RIF solely on the basis of position elimination, making their qualifications irrelevant. Mr. Woosley disputes the fact that his position was eliminated because his photo lab responsibilities were still performed after his layoff. However, the test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position. Mr. Woosley's former responsibilities were divided up and absorbed by a four-person rotation of existing employees, and no new person took over his former responsibilities.

Mr. Furr was selected on the basis of position elimination and performance, making his qualifications relevant only in relation to other employees performing the same functions. Mr. Furr's manager, Mr. Becker, compared Mr. Furr to the other employee in the department performing the same duties and determined that the other employee was a superior performer. It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance. Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

Plaintiffs rely heavily on Seagate's 1992 salary forecasts, arguing that the forecasts were based on the same criteria used in the RIF and thus the employees at the bottom of the forecast should have been laid off first. However, as the Plaintiffs' own witness conceded, the salary forecasts fail to take into account the possibility of position elimination. Further, Plaintiffs attempt to rely on salary forecasts which combine persons

- 16 -

of various occupations from different departments, ignoring the uncontroverted testimony that managers were only allowed to select individuals from within their own departments. Plaintiffs presented no evidence that they were similarly situated to the other employees on the forecasts. The undisputed fact that each manager could only select from individuals in his own department negates the value of an interdepartmental ranking in showing pretext. Considering only the individuals in each manager's individual department, each plaintiff was ranked the lowest of those similarly situated to him.

Finally, as circumstantial evidence of pretext, Plaintiffs claim that Sedlacek, West, and Diffin all ranked their subordinate managers in order of age. While older managers were ranked lower on a whole by these three managers, the uncontroverted testimony was that age was not a factor in the rankings nor were ages included on the rankings. Plaintiffs have produced absolutely no evidence that age was a factor in these rankings, and Plaintiffs each concede that they did not believe their managers would intentionally discriminate on the basis of age. A statistical coincidence does not rise to the level of pretext.

After a careful review of the record in this case, we have determined that even in the light most favorable to the them, Plaintiffs have failed to produce evidence sufficient to demonstrate pretext and to carry their burden of proving intentional age discrimination. Accordingly, we hold that the district court erred in denying Seagate's motion for judgment as a matter of law. Because we find that judgment as a matter of law should be

granted in favor of the Defendant, we need not reach the other issues raised in this appeal.

REVERSED and REMANDED for entry of judgment in accordance with this opinion.