**John E. TOTH, Plaintiff,**

v.

**McDONNELL DOUGLAS AEROSPACE SERVICES COMPANY, Defendant.**

No. 97–152–CIV–ORL–22A.

United States District Court, M.D. Florida, Orlando Division.

Aug. 27, 1998.

Craig M. Rappel, Rappel & Rappel, P.A., Vero Beach, FL, for plaintiff.

David V. Kornreich, Jeffrey E. Mandel, Teresa Adamson Herrmann, Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., Orlando, FL, for defendant.

## *ORDER*

CONWAY, District Judge.

### *I. INTRODUCTION*

The Plaintiff, John E. Toth, formerly was employed by the Defendant, McDonnell Douglas Aerospace Services Company. Toth was terminated from his employment as a result of a reduction in force ("RIF"). He claims that McDonnell Douglas violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, by terminating him on the basis of his age and replacing him with a younger employee, Ken Flemming.

Both sides seek summary judgment. Upon carefully considering the parties' submissions, the Court determines that McDonnell Douglas is entitled to summary judgment on Toth's ADEA claim.[1]

### *II. SUMMARY JUDGMENT STANDARD*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

1. In their final pretrial statement, counsel have reached agreement on most of the facts of this case and many of the controlling legal principles applicable to those facts. *See* Joint Final Pretrial Statement (Dkt.40), ¶¶ 9 & 10, at 10–23. The Court commends counsel for their efforts in that regard.

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Cohen v. United American Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir.1996) (quoting *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir.1994), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995)). "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349. The Court considers the evidence and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

### III. UNDISPUTED FACTS [2]

John Toth was hired by McDonnell Douglas Corporation ("MDC") [3] at its Kennedy Space Center Division ("KSC") in January 1984. Joint Final Pretrial Statement ("PTS") (Dkt.40), ¶ 9(5), at 10. Toth, who was born on December 10, 1932, was 51 years old at the time he was hired. *Id.*, ¶ 9(3) & (5), at 10.

In January 1993, Toth was assigned to the Advanced Product Development Directorate as a Specialist Program Integration Engineer providing support for the Assured Crew Vehicle Return ("ACRV") for NASA. *Id.*, ¶ 9(12), at 11. Ken Flemming, a Principal Program Integration Engineer, was also assigned to provide support on the ACRV for NASA. *Id.*, ¶ 9(13), at 11. A Principal Program Integration Engineer is a lower ranking position to that of a Specialist Program Integration Engineer. *Id.* Toth and Flemming were the only two MDC–KSC employees assigned to provide support engineering

to NASA on the ACRV from January 1993 through December 1993. *Id.*, ¶ 9(14), at 11.

In July 1993, a new directorate, called the Mission Support Directorate, was formed. *Id.*, ¶ 9(8), at 10. The Mission Support Directorate was formed to provide launch site support engineering, planning, scheduling, procedures production and payload transportation to MDC–KSC customers, primarily NASA. *Id.* When the Mission Support Directorate was formed, the ACRV project, along with Toth and Flemming, were transferred to Launch Site Support in the Mission Support Directorate.[4] *Id.*, ¶ 9(15), at 11. Numerous other employees were also transferred from different directorates into the Mission Support Directorate at the time it was formed. *Id.*, ¶ 9(16), at 11–12. However, Toth and Flemming continued to be the only two engineers in the Mission Support Directorate assigned to provide support on the ACRV project. Other Launch Site Support Engineers (Specialist Program Integration Engineers, Principal Program Integration Engineers and others) provided services similar to Toth and Flemming to NASA and other customers on different projects within the Mission Support Directorate, such as Shuttle Payloads, Space Lab and Space Habitat. *Id.*, ¶ 9(17), at 12.

Tim Ferris (d/o/b 10/20/52) was named the Director of the Mission Support Directorate. *Id.*, ¶ 9(9), at 10. Bill Peterson (d/o/b 12/12/55) was the Senior Manager of Launch Site Support within the Mission Support Directorate. *Id.*, ¶ 9(11), at 11. Joe Perry (d/o/b 1/19/40) was Toth's and Flemming's immediate supervisor at the time Toth and Flemming were transferred to the Mission Support Directorate. *Id.*, ¶ 9(16), at 11. Peterson was Perry's immediate supervisor. *Id.*

In November 1993, MDC–KSC again reorganized and the first in a series of four company-wide layoffs occurred. *Id.*, ¶ 9(18), at 12. The reorganization and layoffs were necessitated by numerous budget cuts which

---

2. The undisputed facts set forth herein are derived (in some instances, verbatim) from the "Statement of Admitted Facts" section of the parties' Joint Final Pretrial Statement (Dkt.40), ¶ 9(1)-(42), at 10–18.

3. MDC is now known as "The Boeing Company." PTS, ¶ 9(5), at 10.

4. Launch Site Support was one of several departments within the Mission Support Directorate. PTS, ¶ 9(10), at 10.

affected almost every directorate. *Id.* Approximately eleven employees were selected for layoff from the Mission Support Directorate, five of whom were laid off from Launch Site Support. *Id.* Company-wide, one-hundred and eight (108) employees were laid off from twelve (12) different directorates in November 1993. *Id.*

Following the November 1993 layoffs, Launch Site Support reorganized. *Id.*, ¶ 9(19), at 12. Dave Herst, Manager (d/o/b 9/3/58), became Toth's and Flemming's direct supervisor, while Joe Perry began supervising the others in Launch Site Support. *Id.* Under this reorganization, Toth and Flemming continued to provide support to the ACRV project. *Id.*, ¶ 9(19), at 13.

On or about November 17, 1993, MDC–KSC was informed that the entire NASA budget for the work MDC–KSC was performing on the ACRV was being cut and that the contract with NASA for work on the ACRV would expire by the end of the year. *Id.*, ¶ 9(19), at 12–13. Accordingly, one Specialist Program Integration Engineer (Toth's position) and one Principal Program Integration Engineer (Flemming's position) would be eliminated from the budget as a result of the cancellation of the ACRV project by NASA. *Id.*

In order to implement the layoff procedure, Herst and Perry uniformly ranked and rated all of the Specialist Program Integration Engineers and all of the Principal Program Integration Engineers under their respective supervision in the Mission Support Directorate in accordance with MDC–KSC's RIF procedure. *Id.*, ¶ 9(23), at 14. All of the Specialist Program Integration Engineers and Principal Program Integration Engineers in the Mission Support Directorate were in Launch Site Support and, thus, were under the direct supervision of either Herst or Perry. *Id.*, ¶ (9)24, at 14.

The RIF procedure utilized five criteria to rank individuals for layoff. *Id.*, ¶ 9(25), at 14. These included: ability to perform remaining work (35 points); performance (15 points); service time (20 points); attendance (15

points) and formal education (15 points). *Id.* These criteria were applied to each individual within a particular work group that had been selected by management for layoff (e.g., the Specialist Program Integration Engineers and the Principal Program Integration Engineers). *Id.*

The points awarded under the RIF procedure for service time, attendance and formal education came directly from the MDC–KSC Human Resources Department, which calculated the scores for these objective criteria. *Id.*, ¶ 9(26), at 14. In that regard, employees who were in job categories that were subject to the RIF procedure received one point for every year of service up to a maximum of 20 points. *Id.*, ¶ 9(26), at 14–15. With respect to attendance, each employee was deducted one point for each day within the previous twelve month period in which the employee's attendance records reflected use of a sick or personal day. *Id.*, ¶ 9(26), at 15. With respect to formal education, employees received 15 points for a master's degree or above; 10 points for a bachelor's degree; and 5 points for an associate's degree, completion of a two-year technical degree, airframe and powerplant license, or college credit certificate program. *Id.*[5]

With respect to the ratings for performance and for ability to perform the remaining work, management personnel subjectively calculated the scores to be applied to each individual in accordance with the RIF procedure. *Id.*, ¶ 9(28), at 15. In that regard, Herst and Perry rated the individuals they respectively supervised in both job groups (i.e., the Specialist Program Integration Engineers and Principal Program Integration Engineers). *Id.* Using the five RIF criteria, Toth was ranked against the five other Specialist Program Integration Engineers (ages 54–62) in the Mission Support Directorate: Tom King (d/o/b 12/8/32), Frank Bongiorno (d/o/b 9/24/38), Gene Millner (d/o/b 1/11/40), Jerry Massey (d/o/b 11/1/33) and Zane Tomlinson (d/o/b 8/11/31). *Id.*, ¶ 9(29), at 15–16.[6]

---

5. MDC–KSC has always offered an education program to its employees whereby employees may be reimbursed for completing or continuing education related to their employment. PTS, ¶ 9(27), at 15.

6. As reflected by their dates of birth, King and Tomlinson are older than Toth. PTS, ¶ 9(30), at 16.

After the initial ratings were completed (including the rating for ability to perform the remaining work), Herst, Perry and Peterson met to review the scores in detail. *Id.,* ¶ 9(31), at 16. The rating of each Specialist Program Integration Engineer was reviewed.[7] *Id.* The meeting lasted several hours. *Id.* Once Peterson, Herst and Perry were in agreement, the scores were submitted to Ferris for final approval. *Id.*

Toth was ranked lowest among the Specialist Program Integration Engineers. *Id.,* ¶ 9(32), at 16. In that regard, Toth received only 35 total points, while the others in his job group against whom he was ranked received 57 to 80 points each. *Id.* Toth received zero points in the objective categories of attendance and formal education.[8] *Id.* As a result of his low total score, Toth was selected for layoff from the Specialist Program Integration Engineering job group.[9] *Id.*

While management was in the process of ranking the Specialist Program Integration Engineers and Principal Program Integration Engineers in early 1994, Toth and Flemming went on to perform other job duties. *Id.,* ¶ 9(34), at 17. Specifically, Flemming was loaned temporarily to another directorate to assist in completing the "Stennis Proposal" due to his expertise in propulsion engineering, which was needed to complete the proposal. *Id.* The Stennis Proposal was completed and sent to NASA on March 6, 1994. *Id.* At that time, Flemming returned to work in Launch Site Support of the Mission Support Directorate. *Id.*

From mid-December 1993 until March 11, 1994, Toth worked on the Space Station project in the Mission Support Directorate. *Id.,* ¶ 9(35), at 17. While working on the Space Station project, Toth performed launch site support activities similar to those he per-

formed on the ACRV project. *Id.* Toth's work on the Space Station project included meeting with a NASA counterpart, Minerva Higgins, for two or four hours a day to go over technical coordination. *Id.,* ¶ 9(36), at 17. In addition, Toth attended weekly status meetings for the Space Station project with Higgins, her supervisor, Gene Nelson, and MDC–KSC employee Mark Huckabee for approximately 2 hours per week. *Id.*

On February 25, 1994, Peterson and Herst met with Toth to inform him that due to budget cuts, his employment with MDC–KSC would be terminated. *Id.,* ¶ 9(37), at 18. Toth was laid off from his position as a Specialist Program Integration Engineer in the Mission Support Directorate effective March 11, 1994. *Id.,* ¶ 9(7), at 10.

Following the March 11, 1994 layoff, the number of engineers in the Mission Support Directorate remained reduced by three laid off employees (Toth, Matson and Debbie Bishop [10]); no new Launch Site Support engineers were hired into the Directorate after Toth was laid off. *Id.,* ¶ 9(40), at 18.

On April 25, 1994, the Mission Support Directorate merged with other directorates and became the Systems Operations & Maintenance Directorate. *Id.,* ¶ 9(41), at 18.

## IV. RELEVANT LEGAL STANDARDS

The legal framework for analyzing Toth's ADEA claim is well-summarized in the recent decision of *Zaben v. Air Products & Chemicals, Inc.,* 129 F.3d 1453, 1457 (11th Cir.1997):

> In an unlawful age discrimination case, the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that age was a determining factor in the employer's decision to dismiss him. *Clark*

---

**7.** The ratings for the Principal Program Integration Engineers were also separately reviewed during this meeting. PTS, ¶ 9(31), at 16. Those employees were Flemming (d/o/b 4/7/58), Andy Clark (d/o/b 8/13/48), and Dave Matson (d/o/b 7/8/45). *Id.*

**8.** Although Toth had some college education, he did not have a college degree. PTS, ¶ 9(6), at 10.

**9.** Dave Matson was selected for layoff from the Principal Program Integration Engineering job

group as a result of his low total score of 52 points. PTS, ¶ 9(33), at 16.

**10.** Bishop (d/o/b 6/27/59) was a Senior Systems Engineer in the Mission Support Directorate. PTS, ¶ 9(20), at 13. She volunteered for layoff effective March 11, 1994. *Id.* Additionally, C.M. "Tina" Gawlik (d/o/b 12/15/65) was laid off, effective March 11, 1994, from the non-engineering position of Senior Engineering Schedules Analyst in the Mission Support Directorate. *Id.*

*v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir.1993). In order to survive a motion for summary judgment, the plaintiff must first establish a prima facie case of age discrimination. This may be accomplished by presenting direct evidence of discriminatory intent, such as age-biased statements made by the decision maker, *see Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990); by presenting circumstantial evidence which complies with the test set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); or by presenting a statistical pattern of discrimination, *Earley*, 907 F.2d at 1081. Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. *Clark*, 990 F.2d at 1227. If the employer does so, the burden shifts back to the plaintiff to "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Id.*, at 1228.

\*     \*     \*     \*     \*     \*

[In order to make a prima facie showing in circumstantial evidence cases] involving RIFs and in those where a position is eliminated entirely ... the plaintiff must show (1) that he was in a protected age group and was adversely affected by an employment decision, (2) that he was qualified for the position held at the time of discharge and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision. *Jameson v. Arrow Co.*, 75 F.3d [1528,] 1532 [ (11th Cir.1996) ].

## V. ANALYSIS

It is undisputed that Toth has satisfied the first two elements of a *prima facie* case of age discrimination. In that regard, MDC has conceded that Toth was in a protected

age group, was adversely affected by an employment decision, and was qualified for the position from which he was terminated.[11] Hence, the Court must determine whether Toth has presented sufficient evidence to satisfy the final element of a *prima facie* case, i.e., evidence by which a fact finder reasonably could conclude that MDC intended to discriminate against Toth on the basis of his age. For its part, MDC has articulated a legitimate, non-discriminatory reason for terminating Toth. In that regard, MDC states that it was forced by NASA's budget cuts to conduct a RIF, and that Toth was laid off because he was the lowest-ranking Specialist Program Integration Engineer in the Mission Support Directorate. Accordingly, the Court must further determine whether MDC's proffered reason is pretext. Since the final element of the *prima facie* case and the pretext issue overlap somewhat, and because Toth has intermingled those issues in his summary judgment motion[12], the Court will address the two issues together.[13]

Toth first argues that discriminatory intent and pretext arise from the fact that although the ACRV project was eliminated in December 1993, MDC waited until March 1994 to lay Toth off. This argument is without merit.

The parties have stipulated that MDC–KSC was informed on or about November 17, 1993 that "the entire NASA budget for the work MDC–KSC was performing on the ACRV was being cut and that the contract with NASA for work on the ACRV would expire by the end of the year." PTS, ¶ 9(19), at 12–13. It is uncontroverted that Toth continued working on the ACRV project until mid-December 1993. MDC has presented uncontroverted evidence that it began its layoff procedure in early January 1994. Peterson Affidavit, ¶ 9, at 5. MDC has also presented uncontroverted evidence that "[t]he procedure for layoff takes approximately 8 weeks to complete as each step of the budget

---

**11.** *See* Defendant's Memorandum of Law in Support of its Motion Summary Judgment (Dkt.25) at 3.

**12.** *See* Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support Thereof Instanter (Dkt.14) at 12–16.

**13.** In so doing, the Court recognizes that a finding that Toth has failed to satisfy the final element of his *prima facie* case mandates summary judgment in MDC's favor, without the necessity of reaching the pretext issue.

review and layoff process is carefully checked and reviewed by the KSC Human Resources Department and corporate headquarters in St. Louis, Missouri." Affidavit of Bill Peterson (attachment I to Dkt. 26), ¶ 6, at 4. It is undisputed that MDC informed Toth on February 25, 1994 that his employment with MDC would be terminated, effective March 11, 1994, due to budget cuts. PTS, ¶ 9(7), at 10.

■ Contrary to Toth's suggestion, the timing of the layoff does not suggest discriminatory intent or pretext, particularly given that the holiday season intervened between the budget cut announcement and the initiation of the layoff process. Moreover, Toth appears to overlook the fact that any delay in initiating and completing the layoff process inured to his benefit; the longer that process took, the longer he continued working.

Toth raises an additional timing argument; he contends that it was not the November 1993 ACRV budget cut, but one that occurred in January 1994, that was the true motivating factor behind his termination. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's *Motion for Summary Judgment* (Dkt.31) at 4. Hence, Toth argues, MDC's proffered reason for terminating him is false. In support of this argument, Toth states: "In his deposition, Bill Peterson had stated that there were new NASA budget cuts on the International Space Station in January 1994 *that led to the Plaintiff's layoff.* (See Deposition of Bill Peterson, Page 19, lines 9–14)." Plaintiff's Opposition Memorandum (Dkt.31) at 4 (emphasis supplied). Examination of the cited deposition testimony belies this assertion. First, Peterson did not testify that a Space Station reduction in force occurred in January 1994; he testified about "another budget cut" in response to a question about a February 1994 reduction in force. Peterson Deposition at 19 (lines 6–12). More importantly, Peterson did not state, or even imply, that this subsequent reduction in force led to Toth's layoff. Simply put, Toth's counsel's interpretation of Peterson's testimony is wholly unsupported.

■ Toth next contends that "the criteria used to determine the RIF was [sic] pretext." Plaintiff's Motion at 12. In that regard, he first complains that "the criteria as

a whole was [sic] heavily weighted on subjected [sic] matters[.]" *Id.* In fact, there were two subjective criteria (ability to perform remaining work and performance) and three objective criteria (service time, attendance and formal education). The maximum number of points awardable for the two subjective criteria, combined, was 50; the same number of points could be awarded for the three objective criteria, combined. Hence, the point system was fairly evenly divided among objective and subjective criteria.

In any event, the mere fact that some of MDC's layoff criteria were subjective does not create any inference of discrimination. *See Doan v. Seagate Technology, Inc.,* 82 F.3d 974, 978 (10th Cir.1996) (upholding the use of "potential" as layoff criteria in ADEA case; "the use of subjective criteria does not suffice to prove intentional discrimination"), *cert. denied,* —— U.S. ——, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997); *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 780 (8th Cir. 1995) ("the presence of subjectivity in employee evaluations is itself not a grounds [sic] for challenging those evaluations as discriminatory"). Criteria such as performance and ability to perform remaining work are entirely legitimate. The objective factors among MDC's layoff criteria—service time, attendance and formal education—are equally valid. *See Reynolds v. Land O'Lakes, Inc.,* 112 F.3d 358, 362 (8th Cir.1997) ("seniority ... [is a] legitimate factor[ ] for businesses to consider when determining the manner in which to execute a RIF"); *Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 986 (10th Cir. 1996) ("the manner in which a company chooses to conduct a RIF is within the company's sound business discretion, and Plaintiffs have failed to adduce any evidence that the RIF criteria were a pretext for discriminatory motive"), *cert. denied,* —— U.S. ——, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997). Accordingly, no inference of discrimination arises from the RIF criteria chosen by MDC.

■ Toth also maintains that MDC did not follow its own procedures in calculating his score under the RIF criteria. The Court need not determine whether Toth is correct on this point; even if true, that circumstance would be immaterial in the context of this

case. "[T]he mere fact that some of the criteria on which plaintiff was evaluated may have been ... subject to inaccuracies does not in any way suggest that defendant was motivated by a discriminatory animus." *Coleman v. Prudential Relocation,* 975 F.Supp. 234, 239–40 (W.D.N.Y.1997). More fundamentally, these RIF procedures were applied in the same manner to all of the Specialist Program Integration Engineers. Application of these procedures resulted in the retention of two Specialist Program Integration Engineers who were older than Toth. Under these circumstances, any misapplication of the RIF criteria does not give rise to any inference of discrimination or pretext.

■ Toth also maintains that he was replaced by Flemming. This contention is erroneous. Plain and simple, the position Toth held as Specialist Program Integration Engineer on the ACRV project was eliminated through the RIF. No one was placed in that position after Toth was laid off. That Flemming, a lower-ranking Principal Program Integration Engineer, may have assumed duties that Toth was temporarily performing on the Space Station project prior to his termination [14] does not give rise to any inference of discrimination or pretext.[15] As stated in *Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 763 (8th Cir.1995), "[d]uring a reduction in an employer's work force, ... the fact that the plaintiff's duties were assumed by a younger person is not in itself enough to establish a prima facie case. *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1243 (8th Cir.1991)." [16]

**14.** There is a fact dispute concerning whether, and to what extent, Flemming assumed Toth's duties.

**15.** Even if this Court were incorrect in concluding that assumption of Toth's duties by Flemming would not satisfy the third element of a *prima facie* case in the RIF context, such evidence would nevertheless be insufficient under the circumstances of this case to raise an issue of pretext.

**16.** Even if Flemming "replaced" Toth, that fact would not give rise to any inference of discrimination or pretext. In that regard, even if the Specialist Program Integration Engineers and the Principal Program Integration Engineers had been rated together as a single group, Toth still would have been laid off and Flemming still would have survived the RIF, based on their ratings under MDC's RIF criteria. Since Flem-

■ Finally, Toth argues that statistical evidence supports his age discrimination claim. Dkt. 14 at 16–18. However, Toth's statistical evidence is insufficient to raise an inference of discrimination or pretext "because it fail[s] to compare similarly situated individuals and fail[s] to eliminate nondiscriminatory reasons for the numerical disparities." *Doan v. Seagate Technology, Inc.,* 82 F.3d 974, 979 (10th Cir.1996); *see also Brown v. McDonnell Douglas Corp.,* 113 F.3d 139, 142 (8th Cir.1997) (statistical evidence held not probative of pretext because it failed to analyze treatment of comparable employees and ignored performance evaluations); *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 777–78 (8th Cir.1995) (statistical evidence held not probative of pretext because it failed to analyze treatment of comparable employees). Toth's statistical evidence is "so flawed as to render it insufficient to raise a jury question." *Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 986 (10th Cir. 1996).[17]

## VI. CONCLUSION

Toth has not presented evidence sufficient to satisfy the final element of a *prima facie* case of discrimination in the RIF context, i.e., evidence by which a fact finder reasonably could conclude that MDC intended to discriminate against Toth on the basis of his age. In the face of MDC's articulated nondiscriminatory reason for termination, Toth also has failed to present evidence of pretext. Accordingly, MDC is entitled to summary judgment on Toth's ADEA claim.[18]

ming was entitled to remain with the company, proof that he "replaced" Toth would be insufficient to create an issue of fact precluding summary judgment.

**17.** Toth's remaining summary judgment arguments are equally without merit.

**18.** In their final pretrial statement, the parties stipulated "that no evidence will be presented, or reference made in opening or closing statements," "related to the fact that Defendant's layoff procedures were approved by the EEOC prior to being implemented" and "regarding the FCHR (Florida Commission on Human Relations) or EEOC determinations or with respect to the information contained in either the FCHR or EEOC investigative files." PTS, ¶ 15(2) & (3), at 25. Accordingly, the Court has not considered any such evidence in its summary judgment analysis.

Based on the foregoing, it is ORDERED as follows:

1. Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support Thereof Instanter (Dkt.14), filed April 27, 1998, is DENIED.

2. Defendant's Motion for Summary Judgment (Dkt.24), filed April 27, 1998, is GRANTED.

3. Any other pending motions are moot.

4. The Clerk shall enter a final judgment providing that the Plaintiff, John E. Toth, shall take nothing on his claim against the Defendant, McDonnell Douglas Aerospace Services Company, and that the Defendant shall recover its costs of action.

5. This case is removed from the September 1998 trial calendar.

6. The Clerk shall close this case.